UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RANDY M.,                                    :
            Plaintiff,                       :
                              :
            v.                              :        C.A. No. 20-329JJM
                              :
KILOLO KIJAKAZI,                             :
Acting Commissioner of Social Security,      :
            Defendant.                       :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

      Alleging onset on June 1, 2017, Plaintiff Randy M., now forty-three years old, filed his

third application for Supplemental Security Income ("SSI")[1] pursuant to § 1631(c)(3) of the

Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), on March 8, 2018.  During the

period in issue, Plaintiff lived in his mother's basement isolated from other people, was urged to

accept partial mental health hospitalization (but did not), was involuntarily certified for an in-

patient mental health hospitalization, and was repeatedly assessed with seriously abnormal

mental status evaluations by treating providers.  Also during the period in issue, a

neuropsychological report prepared by a neuropsychologist, Dr. F.R. Sparadeo, concluded that

Plaintiff suffers from "significant impairments in the attention/concentration domain" and from a

"high propensity to be socially detached and withdrawn," with the risk of a "psychotic episode or

a violent outburst or both."  Tr. 343, 349.  Consistent with this report, throughout his adult life,

Plaintiff has frequently been arrested and occasionally briefly jailed for disorderly conduct or

violent outbursts, but he has almost never succeeded in performing meaningful work; his

---

[1] Plaintiff's first SSI application was accompanied by one seeking Disability Insurance Benefits ("DIB") under §
405(g) of the Act.  The second and third are SSI only.

attempts to work ended in failure because of conflict with others or because of Plaintiff's disorganization.  In recent years, Plaintiff has avoided "trouble" by just staying in the basement.[2]  Yet, Plaintiff's disability application was denied by an administrative law judge ("ALJ") in reliance on the administrative findings of a state agency psychologist who had seen almost none of Plaintiff's extensive mental health treating record.

Plaintiff argues that the ALJ fashioned a mental residual functional capacity ("RFC")[3] finding based on his lay interpretation of the evidence and exacerbated this error by rejecting Plaintiff's request at the hearing that a medical expert be procured.  ECF No. 16-1.  He also attacks the ALJ's Step Two determination that neither his left knee pain nor his back pain nor his migraine headaches amount to severe impairments.  Id. at 21.  Citing Sacilowki v. Saul, 959 F.3d 431, 441 (1st Cir. 2020), Plaintiff additionally contends that the record contains no evidence directly to rebut his subjective statements and testimony regarding both his mental and physical symptoms and that the ALJ erred in disregarding them.  ECF 16-1 at 19.  Finally, Plaintiff challenges the ALJ's rejection of June 28, 2017, as Plaintiff's protective filing date.  Id. at 23.

These arguments are incorporated into Plaintiff's motion to reverse, which seeks remand for an award of benefits based on the overwhelming nature of the evidence.  ECF No. 16.  The counter motion of the Commissioner of Social Security ("Commissioner") argues that the ALJ's

---

[2] From 1994 until 2006, Plaintiff had minimal income, averaging less than $5,000 per year, with several years with no income; a single exception is 2001 when he earned almost $20,000.  Tr. 243-44.  Between 2007 and 2019, he earned $800 in one year and otherwise there is no record of any income at all.  Id.  When he has worked, the jobs ended quickly because of his disorganization or not getting along with co-workers.  Tr. 70-71.  Despite thirty arrests for minor matters (yelling, fighting, arguing and shoplifting, as well as courts costs and fines, Tr. 78, 343), Plaintiff has spent a total of less than two years in jail.  Id.  That is, his lack of any meaningful work history is not explained by lengthy periods of incarceration.  Plaintiff testified that he had not been arrested in the six years preceding the ALJ hearing because he "stay[s] in the basement . . . to stay away from other people so [he doesn't] get in trouble."  Tr. 81.

[3] "RFC" or "residual functional capacity" is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

decision appropriately rests on substantial evidence and should be affirmed.  ECF No. 19.  Both motions have been referred to me for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.   <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), <u>aff'd</u>, 230 F.3d 1347 (1st Cir. 2000) (per curiam).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128-131 (1st Cir. 1981).  The determination of substantiality is based upon an evaluation of the record as a whole.  <u>Brown</u>, 71 F. Supp. 2d at 30; <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30.  The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the

evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g). Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)). If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits. Sacilowski, 959 F.3d at 440-41; Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

## II.   Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 416.905. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

### A.   The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 416.920. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. §

416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 416.920(d).  Fourth, if a claimant's

impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. §

416.920(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 416.920(g).  Significantly, the claimant bears the burden of proof at

Steps One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski, 959

F.3d at 434; Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process

applies to SSI claims).

### B.      Step Two Determination

An impairment is "not severe" at Step Two if the medical evidence establishes no more

than a slight abnormality that would have only a minimal effect on an individual's ability to

work.  SSR 85-28 at *2, 1985 WL 56856 (Jan. 1, 1985).  Step Two is a screening device used to

eliminate applicants "whose impairments are so minimal that, as a matter of common sense, they

are clearly not disabled from gainful employment."  McDonald v. Sec'y of Health & Human

Servs., 795 F.2d 1118, 1123 (1st Cir. 1986); Burge v. Colvin, C.A. No. 15-279S, 2016 WL

8138980, at *7 (D.R.I. Dec. 7, 2016), adopted sub nom., Burge v. Berryhill, 2017 WL 435753

(D.R.I. Feb. 1, 2017).  Further, if there is error at Step Two, but the sequential analysis continues

because of another severe impairment, the error is generally deemed harmless.  White v. Colvin,

No. C.A. 14-171S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015); see Syms v. Astrue, Civil

No. 10-cv-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011) ("[A]n error at Step Two

will result in reversible error only if the ALJ concluded the decision at Step Two, finding no

severe impairment.") (collecting cases).

### C.      Opinion Evidence

For applications like this one, filed on or after March 27, 2017, the SSA has

fundamentally changed how adjudicators assess opinion evidence.  The familiar and

longstanding requirements – that adjudicators must assign "controlling weight" to a well-

supported treating source's medical opinion that is consistent with other evidence, and, if

controlling weight is not given, must state the specific weight that is assigned – are gone.  20

C.F.R. § 416.920c(a).  Instead, adjudicators "will not defer or give any specific evidentiary

weight, including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s), including those from . . . medical sources."  Id.  Rather, an ALJ must consider the

persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 416.920c.

The most important factors to be considered when the Commissioner evaluates persuasiveness

are supportability and consistency; these are usually the only factors the ALJ is required to

articulate.  20 C.F.R. § 416.920c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (M.D. Tenn.

2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6,

2019).  Supportability "includes an assessment of the supporting objective medical evidence and

other medical evidence, and how consistent the medical opinion or . . . medical finding[] is with

other evidence in the claim."  Revisions to Rules Regarding the Evaluation of Medical Evidence,

82 Fed. Reg. 5844, 5859 (Jan. 18, 2017).  Other factors that are weighed in light of all of the

evidence in the record includes the medical source's relationship with the claimant and

specialization, as well as "other factors" that tend to support or contradict the medical opinion or

finding.  See 20 C.F.R. § 416.920c(1)-(5).  Revisions to Rules Regarding the Evaluation of

Medical Evidence, 82 Fed. Reg. at 5859.  "A medical opinion without supporting evidence, or

one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  Id. at 5854.

    **D.**    **Evaluation of Claims of Mental Impairment**

    The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique ("PRT") that assesses impairment in four work-related broad functional areas: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentration, persistence or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 416.920a(c)(3).  The ALJ uses a five-point rating scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).  If the impairment causes no or "mild" difficulties in these areas, the ALJ generally will find that it is not severe.  20 C.F.R. § 416.920a(d)(1).  On the other hand, for an individual diagnosed, for example, with depressive disorder as described in Listing 12.04, anxiety disorder as described in Listing 12.06, or personality/impulse control disorder as described in Listing 12.08, if the diagnosed impairment causes marked limitations in at least two of the broad functional areas, or extreme limitations in at least one of the broad functional areas, the ALJ will find that the "paragraph B criteria" necessary to establish those Listings are equaled or met.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12:00(A)(2)(b) ("To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning.").  Alternatively, Listings 12.04 and 12.06 can also be established for serious and persistent mental illness if the claimant's limitations meet or equal the "paragraph C criteria." Id. §12.00G.

    The PRT is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process and, if found to be severe, also serves as the backdrop for the more

detailed mental RFC assessment at Step Four.  See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 374184 (July 2, 1996).  The ALJ must incorporate pertinent findings and conclusions based on the PRT into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas.  20 C.F.R. § 416.920a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2021 ed.).

### E.    Reliance on Experts

An ALJ cannot render a medical opinion in the face of conflicting and inconsistent medical evidence without the assistance of a medical expert.  Santiago v. Sec. of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) ("[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.").  If the medical evidence is such that a "reasonable mind might accept [it] as adequate to support a conclusion" of disability, the ALJ cannot rest on his untutored lay analysis to interpret it otherwise.  Sherry B. v. Saul, C.A. No. 20-140-JJM-PAS, 2021 WL 508517, at *2 (D.R.I. Feb. 11, 2021) (quoting Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019)).  Relatedly, it is error for an ALJ to deny benefits in reliance on a consulting or a non-examining expert physician or psychologist who, despite expertise, was not privy to parts of the medical record that evidence worsening or that support the claimed limitations.  Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006); Virgen C. v. Berryhill, C.A No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018); Cruz v. Astrue, No. C.A. 11-638M, 2013 WL 795063, at *13 (D.R.I. Feb. 12, 2013), adopted, 2013 WL 802986 (D.R.I. Mar. 4, 2013).  In such circumstances, without procuring testimony from a medical expert who has interpreted the entire medical file, the ALJ is substituting his lay judgment for a necessary expert medical opinion; the

resulting decision is subject to remand because it is not supported by substantial evidence.  Hall v. Colvin, 18 F. Supp. 3d 144, 152 (D.R.I. 2014).

### F.      Credibility of Claimant's Subjective Statements

Where an ALJ decides not to fully credit a claimant's subjective statements, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  However, in the absence of evidence that directly rebuts the claimant's testimony or presents some other reason to question its credibility, the ALJ must take the claimant's statements as true.  Sacilowski, 959 F.3d at 441.

## III.   Analysis

### A.      The ALJ's Mental Health Determinations

The ALJ's mental RFC is based on the administrative findings of Dr. Lori Perretta, an expert non-examining state agency psychologist, whom he found to be "persuasive."  Tr. 24.  In turn, Dr. Perretta relied on a medical file, which, as of her review, contained only a few pages of treating records from the Addictive Recovery Institute, reflecting only Plaintiff's daily methadone and related monitoring, Tr. 331-41, as well as a consulting examination report prepared by a state agency psychologist, Dr. Louis Turchetta, Tr. 351-55, and the neuropsychological report prepared by the specially engaged clinical neuropsychologist, Dr. Sparadeo, Tr. 343-50.  In all, the record pertinent to Plaintiff's mental functioning that Dr. Perretta saw totals twenty-seven pages.  Tr. 331-57.  Based on her file review, Dr. Perretta considered whether Plaintiff suffers from attention deficit/hyperactivity disorder ("ADHD"), anxiety disorder or addictive disorder and found that none of these were actually established as

medically determinable impairments ("MDI").  Tr. 142.  Contradicting her own finding of no

MDI, Dr. Perretta provided a PRT opinion and mental RFC based on her conclusion that Plaintiff

was moderately limited in each of the broad functional areas.  TR. 142-47.

The two examining reports on which Dr. Perretta relied may be briefly summarized.

First, Dr. Turchetta's consulting examination report is based on an hour-long clinical interview

and review of a 2016 consultative report that is not in the record.  Tr. 351-55.  Accepting at face

value Plaintiff's statement that he "has a good relationship with his mother," Tr. 352, and in

reliance on the mental status examination performed during their brief encounter, Dr. Turchetta

diagnosed ADHD, social anxiety and opioid use disorder treated with medication and found that

Plaintiff could respond appropriately to co-workers, supervision, and daily work pressures, and

that "his prognosis is good."  Tr. 355.  In contrast, Dr. Sparadeo's examination report is based

not only on a full clinical interview but also on extensive neuropsychological testing conducted

over four days of direct encounters with Plaintiff and, for at least part of the time, his mother,

with briefing on a fifth day.  Tr. 343.  As a result, Dr. Sparadeo observed Plaintiff's interaction

with his mother, which he described in the report as "alarming in that he is impulsively hostile

toward [her] and easily becomes enraged by her."  Tr. 348.  Based on diagnoses of ADHD,

provisional post-traumatic stress disorder, moderate depressive disorder, "R/O" bipolar disorder

and medically managed opioid dependence, Dr. Sparadeo's extensive testing and observation

resulted in the functional findings that, while Plaintiff has average intellectual ability, he also has

"significant impairments in the attention/concentration domain"; further, while Plaintiff has only

moderate depression, he also has a "high propensity to be socially detained and withdrawn," with

a "high probability of acting out impulsively and will likely do so in the presence of those he

continues to have relationships with."  Tr. 348 (emphasis supplied).  Dr. Sparadeo noted that

Plaintiff lives in the "harsh environment" of his mother's basement, is dependent on his mother, yet is "in frequent conflict with [her]," has "no social stimulation," and has "a great deal of resentment for most people," including "bouts of anger and ideas of persecution," which "may lead to either a psychotic episode or a violent outburst or both."  Tr. 348-49.

In opining to no more than moderate limitations, Dr. Perretta did not try to reconcile the seemingly stark differences between the Sparadeo and Turchetta reports; instead, she cherry-picked findings from each.  Tr. 142-47.  Importantly, Dr. Perretta's analysis expressly relies on the lack of mental health treatment reflected in the record that she reviewed: "[t]he only psych TS records are brief notes from Addictive Recovery Institute."  Tr. 143.

Unseen by Dr. Perretta is Plaintiff's extensive treating record from CODAC, which spans almost the entire period, from March 2018 to late June 2019.[4]  Tr. 365-440.  These notes reflect that Plaintiff was receiving intensive mental health treatment from Nurse Michelle Crandall, APRN CNS, and Ms. Tawny Solmere, MA LCDS, whom he saw up to four times a month. Their detailed notes are consistent with Plaintiff's subjective statements regarding his mental challenges, as summarized by the ALJ (Tr. 17).  They reflect frequent seriously abnormal mental status observations: for example, "poor" grooming; "restless" and "rocking" movements; "angry," "sullen" or "irritable" mood/affect; "rapid" speech; "poor eye contact"; "poor" insight and judgment; "circumstantial," "tangential," "perseverative," "ruminat[ive]," "[g]randiose[e]," and "bizarre" thoughts and thinking patterns; and living in near total social isolation except for

---

[4] Plaintiff's treating relationship with Nurse Crandall began prior to March 2018, although it is not clear that she was then affiliated with CODAC.  Randy M. v. Berryhill, C.A. No. 18-00175-JJM, 2019 WL 1091389, at *6-7 (D.R.I. Mar. 8, 2019), adopted, 2019 WL 2325997 (D.R.I. May 31, 2019) (referencing 2017 opinion of treating psychiatric nurse, Ms. Crandall).  Shortly before the ALJ hearing, Plaintiff abandoned his longtime treating providers at CODAC because of his disagreement with Nurse Crandall's cautious approach to prescribing Adderall.  Tr. 75-76, 439.  The record not seen by Dr. Perretta also includes a handful of records from the new providers at Wellness RI. Tr. 719-27.

treating providers and his dependent but hostile relationship with his mother.  E.g., 365, 370,

372, 377, 381, 383, 387, 389, 397, 416, 419.  There is no evidence of sustained improvement

with treatment; the rare examination reflecting near normal observations (e.g., Tr. 415) is

followed by others that are seriously abnormal.  E.g., Tr. 416-19.  Plaintiff's prognosis is

described as "guarded."  Tr. 399.  Nurse Crandall at least twice urged Plaintiff to enter a partial

hospitalization program, but he did not go.  Tr. 409, 433.

Also unseen by Dr. Perretta are the extensive medical records from Newport Hospital and

the Providence Center's Crisis Stabilization Unit.  Tr. 442-676.  These reflect a relatively long

(five day) involuntary mental health in-patient hospitalization at Newport Hospital triggered by

his mother's call to the police.  Tr. 446.  Despite Plaintiff's vigorous protests and attempts to

minimize his symptoms, based on his mother's report and on various providers' clinical

observations of Plaintiff's behavior, he was sent to Newport Hospital after being certified at Kent

Hospital as needing immediate psychiatric care and treatment because he was a "substantial risk"

to himself or others.  Tr. 521-23.  This hospitalization was followed by a week at the Providence

Center's Crisis Stabilization Unit.  Tr. 639-77.  Nothing in these treating records is inconsistent

with Plaintiff's testimony and subjective statements about his mental health symptoms; to the

contrary, these records are corroborative, suggesting only Plaintiff's tendency to understate the

seriousness of his psychiatric symptoms, such as when he told Dr. Turchetta that his relationship

with his mother is good.

The ALJ declined Plaintiff's request at the hearing that he continue the matter to procure

the professional opinion of a medical expert to analyze the more than 300 pages of mental health

treating records not seen by Dr. Perretta.  Tr. 10 n.2, 93.  Instead, he reviewed them himself and

found that "the subsequent evidence does not warrant a change in the pertinent findings of Dr.

Perretta or the persuasiveness of her opinion." Tr. 24. With respect to the inconsistencies between the reports of Dr. Sparadeo and Dr. Turchetta, the ALJ did not attempt to reconcile them, but found both to have "some persuasive value." Id. Practically speaking, the ALJ's PRT, which finds moderate limits in all areas, and his RFC, which limits Plaintiff to simple work with few workplace changes, occasional contact with the public and superficial contact with coworkers and supervisors, are both drawn from Dr. Perretta's findings. Tr. 16.

As in Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898 (D.R.I. May 4, 2020), the Court need not linger long to conclude that the ALJ's reliance on Dr. Perretta is a serious and material error in that it clashes – in this case dramatically[5] – with the well-settled principle that a denial of benefits cannot rest on the opinions of "state agency physicians [who] were not privy to parts of [plaintiff's] medical record [which] detract from the weight that can be afforded their opinions. Id. at *5 (citing cases). Virgen C. v. Berryhill crisply captures the concept: "if a state-agency physician reviews only a partial record, her opinion cannot provide substantial evidence to support [an] ALJ's residual functional capacity assessment if later evidence supports the claimant's limitations." C.A. No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018) (internal quotation marks omitted); see Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam) (if post-review records have indications of worsening that require medical interpretation, adjudicator's reliance on reviewer's opinions require remand). Mindful of Dr. Perretta's emphasis on Plaintiff's seeming (to her) lack of any substantive mental health treatment, I find that it is overwhelmingly clear that Dr. Perretta's findings would have been entirely different if she had been aware of Plaintiff's intensive treatment at CODAC, where providers made repeated abnormal observations, recommended partial hospitalization and found

---

[5] As Plaintiff accurately emphasizes, the file that Dr. Perretta reviewed contained a total of thirty-four pages; the portion of the record she did not see contains more than 360 pages. ECF No. 16-1, at 15.

Plaintiff's prognosis to be guarded, and of the significant worsening in Plaintiff's mental functioning, resulting in his involuntary hospital stay at Newport Hospital, followed by another week at the Providence Center's Crisis Stabilization Unit.  See Mary K. v. Berryhill, 317 F. Supp. 3d 664, 668 (D.R.I. 2018) (remand required when unknown whether non-examining physicians would have rendered same opinions if they had all medical evidence).  Therefore, Dr. Perretta's findings cannot amount to substantial evidence to support either the ALJ's PRT analysis or his RFC findings.

The ALJ's error in relying on Dr. Perretta is compounded by his seriously flawed lay interpretation of the materials she did not review, resulting in the conclusion that they do "not warrant a change in the pertinent findings of Dr. Perretta or the persuasiveness of her opinion." Tr. 24.  This conclusion is tainted not only because it is based on the ALJ's lay opinion but also because it rests on significant inaccuracies – the findings, for example, that the CODAC mental status examinations were "within normal limits" (they are not), that "claimant's condition was noted to improve with medications" (occasional improvements were not sustained), and that Plaintiff "generally" demonstrated "appropriate eye contact" (almost half of eye contact observations were "poor," "fair" or 'intermittent," or "sporadic").  Tr. 19, 22.  These misinterpretations also supply the principal support for the ALJ's finding that Plaintiff's testimony and statements about his mental functioning[6] are not consistent with the medical evidence.[7]  See Sacilowski, 959 F.3d at 441 (ALJ may discount claimant's allegations based on

---

[6] By contrast, the ALJ's decision to discount Plaintiff's claims of disabling physical symptoms is well supported. See infra.

[7] Otherwise, as Plaintiff correctly points out, the ALJ's "credibility" finding is improperly based on cherry-picking Plaintiff's failed or imagined attempts to do something productive and on the ALJ's misinterpretation of the record. For example, the ALJ found that Plaintiff's existence in his mother's basement means that he "lives independently and adequately maintains a household." Tr. 23.  There is no evidence to support this finding; to the contrary, the basement is characterized as a "harsh environment" by Dr. Sparadeo, while the CODAC notes reference abnormal thought content "related to lack of organization in living space." Tr. 348, 377.  According to Plaintiff's testimony,

record evidence that directly rebuts testimony; without substantial evidence to support reasons to discount statements, they must be taken as true).  Far from being ignored, Plaintiff's statements about his disorganization and his inability to function in proximity to others are unrebutted and should have been taken as true.  Id.

These material errors plainly require remand.  The more difficult question is whether the Court should send the matter back for further proceedings (including to require that the ALJ procure an opinion from a medical expert) or for the award of benefits.  Sacilowski, 959 F.3d at 436-37.  The latter course is reserved for rare cases where the evidence supporting disability is strong or overwhelming and does not include unresolved factual issues that warrant further development on remand.  Id. at 437, 441.  In the circumstances of this case, the finding that the evidence is overwhelming is not a close call: Dr. Sparadeo's conclusions regarding Plaintiff's functional capacity clearly establish that, in at least two, if not three, of the "paragraph B criteria" broad areas of functioning, Plaintiff's limitations are marked, if not extreme.[8]  The CODAC, Newport Hospital, and Providence Center records are all consistent with Dr. Sparadeo's analysis as is the evidence of Plaintiff's lack of almost any normal activity outside of

___

the basement is "always disorganized" and "cluttered," clothing gets "moldy," and his mother complains that he is a "hoarder."  Tr. 76-77, 80.  That is, the evidence uniformly establishes that this basement is not an appropriate living environment.

[8] As to the "paragraph B criteria," for the functional area of interacting with others, Dr. Sparadeo opined that psychological testing revealed that Plaintiff has a "high propensity to be socially detached and withdrawn"; Tr. 348, for the functional area of concentration, persistence or pace, Dr. Sparadeo opined that psychological testing revealed that Plaintiff has "significant impairments in the attention/concentration domain"; Tr. 348, and for the functional area of adapting or managing oneself, Dr. Sparadeo opined that psychological testing revealed that Plaintiff has a "high probability of acting out impulsively", and that "his fragility may lead to either a psychotic episode or a violent outburst or both."  Tr. 348-49.  In addition to these "paragraph B criteria," Plaintiff correctively points out that the evidence also appears overwhelmingly to establish that the alternative "paragraph C criteria" (which are applicable to Listings 12.04 and 12.06) are equaled or met by the persistence over at least two years of Plaintiff's "fragility" as found by Dr. Sparadeo, coupled with Plaintiff's inability to function in the presence of others outside of his mother's basement, except in the structured setting of a mental hospital.  As limned in § 12.00G(2)(c), the paragraph C criteria are met when serious symptoms persist for at least two years, characterized by "'[m]arginal adjustment' mean[ing] that your adaptation to the requirements of daily life is fragile . . . . [and] you have become unable to function outside of your home. . . . [potentially with] episodes of deterioration that have required you to be hospitalized."  20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00G(2)(c).

his mother's basement, coupled with his testimony about his mental functioning, which is unrebutted and must be taken as true. This evidence overwhelmingly establishes that Plaintiff's impairments meet or equal Listings 12.04, 12.06, and 12.08, which in turn compels a finding of disability.

What remains is whether there is a potential unresolved factual dispute arising from the findings in Dr. Turchetta's report, which are so dramatically different from the findings made by Dr. Sparadeo. However, unlike Dr. Sparadeo's analysis, Dr. Turchetta's report was not based on any clinical testing. Indeed, the report itself acknowledges its limitations:

> The impressions described here are based on [Plaintiff's] description of his life history and this one-hour appointment. There may be other medical limitations not assessed in this evaluation or other psychological factors not discussed in this assessment that may further impact his functioning.

Tr. 355. Considering the limited information that he had to work with, Dr. Turchetta accepted Plaintiff's statement that he "has a good relationship with his mother," Tr. 352, and relied on it as part of the support for his finding of the ability to function appropriately with co-workers and supervisors. This statement is revealed by the more extensive observations of Dr. Sparadeo and the CODAC treating providers to be inaccurate, though consistent with the Plaintiff's disordered thinking about his mother, as vividly described in the CODAC records. Similarly, Dr. Turchetta opined to a "good" prognosis, in stark contrast to the treating source opinion that Plaintiff's prognosis is "guarded." Tr. 355, 399. That is, because of the concededly limited nature of Dr. Turchetta's examination, the Turchetta report's inconsistent conclusions clash with the clinical evidence from other sources whose opinions are far better supported by objective and (in the case of CODAC) longitudinal observations. See 20 C.F.R. § 416.920c(b)(2) (persuasiveness of medical opinions depends on supportability and consistency). Therefore, the Turchetta report's apparent contradiction of the Sparadeo findings does not persuasively give rise to a factual

16

dispute to be resolved on remand.  See 82 Fed. Reg. at 5854 ("[a] medical opinion . . . that is inconsistent with evidence from other sources [is] not . . . persuasive").

Based on the foregoing, I find that the evidence of disability based on Plaintiff's mental limitations is overwhelming and that there are no unresolved factual issues that warrant further development on remand.  Mindful that courts should ensure "a just outcome in Social Security disability claims," Mary K. v. Berryhill, 317 F. Supp. 3d 664, 667 (D.R.I. 2018) (internal quotation marks omitted), I recommend remand for an award of benefits.

### B.      The ALJ's Physical Determinations

There is no error in the ALJ's well supported finding that Plaintiff's left knee, lower back and migraines are not severe at Step Two, particularly where the ALJ's RFC took the limitations that these impairments cause into account (finding Plaintiff could do less than the full range of medium work with additional postural limits).  White, 2015 WL 5012614, at *8 (if error at Step Two, but sequential analysis continues, error generally deemed harmless).  In the treating records, Plaintiff's MRIs and physical examinations of his knee and back were largely benign. Tr. 359-60.  There is no diagnosis of migraine.  The examining physician, Dr. Jay Burstein, found Plaintiff capable of standing, walking, climbing stairs, bending, twisting, and lifting up to thirty pounds.  Tr. 364.  The non-examining state agency physicians on whom the ALJ appropriately relied examined the medical evidence; as to the handful of additional treating records developed after the state agency file review, Tr. 698-718, the ALJ correctly found that these are just as benign as what preceded them.  Tr. 15; e.g., Tr. 698-99 (primary care notes mention low back pain, but no treatment suggested; no mention of knee or headache); Tr. 703 (back pain mentioned to primary care physician who suggests ibuprofen); Tr. 707 (physical examination of back yields normal findings; no mention of knee or headaches).  In such a

circumstance, where the ALJ has appropriately relied on examining and non-examining state agency experts, supplemented by his own common-sense observation that the post-file review records reflect the same symptoms with no indication of worsening, his decision should be affirmed.  Andrea T., 2020 WL 2115898, at *6; Michele S. v. Saul, C.A. No. 19-65WES, 2019 WL 6242655, at *8 (D.R.I. Nov. 22, 2019).  Also well supported is the ALJ's discount of Plaintiff's testimony, for example, that he sometimes needed crutches and could not walk for more than ten minutes, Tr. 17, which is directly rebutted by Dr. Burstein's finding on examination of the ability to walk without such limitations.

I recommend that the ALJ's decision regarding Plaintiff's physical limitations be affirmed.

### C.    The ALJ's Protective Filing Date Determination

The protective filing date is the date a disability applicant first contacts the Social Security Administration ("SSA") indicating an intent to file an application; this date is significant because it is used to determine when an individual can start receiving benefits. POMS GN 00204.010, Protective Filing.  Normally, a letter sent to SSA is enough to set the protective filing date.  20 C.F.R. § 416.340 ("We will use the date a written statement, such as a letter, . . . is received at a social security office, . . . as the filing date of an application for benefits.").  However, this liberality in setting the protective filing date became problematic for SSA in circumstances where an applicant already had an application pending that sought benefits under the same provision of the Act.  To address this concern and eliminate the improper payments and increased costs and workloads it was causing, in 2011, SSA adopted SSR 11-1p, Procedures for Handling Requests to File Subsequent Application for Disability Benefits, SSR 11-1p, 2011 WL 3962767 (July 28, 2011).  Pursuant to this SSR, SSA generally prohibits an

applicant from having more than one claim for the same type of benefits pending at the same time.  Id. at *1-4.  That is, for an applicant with a pending SSI application that is still under review, a protective filing date cannot be procured for a new SSI application until the review of the prior one is completed, except in limited circumstances specified in SSR 11-1p.

In this case, the ALJ found that Plaintiff filed his third SSI application on March 14, 2018, with a protective filing date of March 8, 2018.  Tr. 10-11; see Tr. 235.  However, prior to filing this third application, Plaintiff had sought Appeals Council review of a different ALJ's May 31, 2017, denial of his second SSI application.  See Tr. 10 n.1, 99-112.  This request for review was set forth in a letter to the Appeals Council dated June 28, 2017.  ECF No. 16-2 at 1. The Appeals Council denied review on February 1, 2018, and the Commissioner's decision denying SSI ultimately was affirmed by this Court on March 8, 2019.  Randy M., 2019 WL 1091389, at *1, 8.  Plaintiff's current SSI application was filed shortly after the Appeals Council denied review of the prior SSI application.

In the June 28, 2017, letter to the Appeals Council regarding his second application, Plaintiff included the following sentence: "please use this correspondence with the Appeals Council as a Protective Filing Date for a new application in the event that [Plaintiff's] Request for Review is denied."  ECF No. 16-2.  This request was reiterated in a second letter to the Appeals Council sent on August 18, 2017.  No new evidence was submitted with either of these letters.

In his decision, the ALJ denied Plaintiff's request for a protective filing date of June 28, 2017, in reliance on SSR 11-1p.  Tr. 10-11.  This SSR clearly advises claimants that it was promulgated to create "new procedures" effective as of July 28, 2011, pursuant to which "generally you will no longer be allowed to have two claims for the same type of benefits

19

pending at the same time." SSR 11-1p, 2011 WL 3962767, at *2. SSR 11-1p acknowledges that this policy puts an applicant on the horns of a dilemma: "you will have to choose between pursuing your administrative review rights on the pending disability claim or declining to pursue further administrative review and filing a new application." Id. For a pending application that has reached the Appeals Council phase of review, SSR 11-1p creates a limited exception to this seemingly harsh rule. Noting that claimants may submit new evidence to the Appeals Council, SSR 11-1p provides that, if new evidence is submitted that the Appeals Council finds is related to a period after the period under review, the Appeals Council will return that new evidence with a notice. Id. at *3. If these prerequisites occur, SSR 11-1p goes on:

> The notice returning the additional evidence will explain why the Appeals Council did not accept the evidence and inform you that, under certain circumstances, we will consider the date you filed the request for Appeal Council review as the filing date for your new claim.

Id. (emphasis added). To lock in such an earlier filing date for an SSI claim, SSR 11-1p mandates that the new application must be filed within sixty days of the date of the notice returning the new evidence and informing the claimant of the opportunity to have a protective filing date based on the request for Appeals Council review. Id. If the application is filed in the sixty-day period, the date when Appeals Council review of the prior claim was requested is treated as the protective filing date of the new claim. Id.

Here, Plaintiff's request for Appeals Council review of his prior SSI claim did not involve the submission of new evidence; therefore, it is unambiguous that the Appeals Council received nothing arguably pertinent to the period after the prior ALJ's decision. With no post-period evidence, the Appeals Council did not send a notice returning evidence nor did it advise Plaintiff of his ability to use the date of his request for Appeals Council review as the filing date for a new application. Because Plaintiff plainly does not fit into the narrow SSR 11-1p exception

to the prohibition on filing a new SSI application while his prior SSI application was still under review, the ALJ properly declined to extend Plaintiff's protective filing date back to June 28, 2017. Tr. 10-11.

Plaintiff's argument that the ALJ erred founders in the face of the clear words in SSR 11-1p. While Plaintiff's frustration with the way that SSA has limited an SSI claimant's ability to get benefits for a past period as long as there is a prior application pending is understandable, that is the procedure SSA has established. Plaintiff has not challenged SSR 11-1p's constitutionality or legal legitimacy. See Norton v. Berryhill, No. 8:16-cv-2599-T-30AEP, 2019 WL 3254626, at *9-14 (M.D. Fla. June 26, 2019), adopted, 2019 WL 3254205 (M.D. Fla. July 19, 2019), appeal dismissed, No. 19-13667-AA, 2019 WL 6977414 (11th Cir. Nov. 22, 2019) (due process and equal protection challenges to SSR 11-1p rejected). I find that the ALJ committed no error in refusing to grant Plaintiff's request for the earlier protective filing date and recommend that this aspect of his decision be affirmed.

**IV.    Conclusion**

Based on the foregoing, I find that the ALJ's findings regarding Plaintiff's physical limitations should be affirmed, but that the evidence overwhelmingly establishes that Plaintiff was disabled during the period in issue due to mental health-based limitations. I further find that Plaintiff's protective filing date for benefits was correctly set as March 8, 2018. Therefore, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 16) be GRANTED and that the Court remand the matter for an award of benefits consistent with these findings. I further recommend that Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 19) be DENIED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 5, 2021